PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
8305 Vickers Street, Suite 209
San Diego, CA 92111
Ph: (619) 609-0860
Email: patrick@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiffs, <br> v. <br><br> BAPKO METAL, INC., a California Corporation; <br><br> Defendants. | Civil Case No. **'23CV0391 MMAKSC** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.     On December 22, 2022, Plaintiffs issued a 60-day notice letter ("Notice Letter") to BAPKO Metal, Inc. ("BAPKO" or "Defendant") and Clark Steel Fabricators, Inc. ("Clark Steel") as the owner(s) and/or operator(s) of the Facility located at 12610 Vigilante Road, Lakeside, California 92040 ("BAPKO Facility" or "Facility"), regarding their violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.     Plaintiffs mailed the Notice Letter to the Facility's physical address, 12610 Vigilante Road, Lakeside, California 92040 via certified mail, to Clark Steel at P.O. Box 1370, Lakeside, CA 92040 via certified mail, and to BAPKO's Agent for Service of Process, Tim Black, 721 South Parker Street, Suite 300, Orange, CA 92868 via U.S. mail.

4.     Plaintiffs also mailed the Notice Letter to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C.

§ 1365(b)(1)(A).

5.  More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.  Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.  <u>INTRODUCTION</u>

7.  Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the BAPKO Facility.

8.  Specifically, Defendant has discharged and continues to discharge polluted storm water from the BAPKO Facility to downstream waters and groundwater including San Vicente Creek, the lower segment of the San Diego River, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

9.  Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the CWA and the IGP.

10.  With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the BAPKO Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

11.  Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

12.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

13.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14.     The polluted discharges from the BAPKO Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

**III.     PARTIES**

15.     BAPKO Metals, Inc. is an active California corporation and is the Owner and/or Operator of the Facility.

16.     Plaintiffs are informed, believe, and thereon allege, on or about October 1, 2022, BAPKO purchased the Facility from Clark Steel Fabricators, Inc. BAPKO also purchased the right, title and interest in and to the name "Clark Steel."

17.     Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal

estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

18.     Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

19.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

20.     Plaintiffs' members have an interest in accurate information about Defendant's discharges. Defendant's failure to accurately report and monitor impedes Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific, educational, and spiritual purposes.

21.     Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

22.     The violations of the IGP and CWA at the BAPKO Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

23.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

24.     An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.     **LEGAL BACKGROUND**

### A.     **The Clean Water Act.**

25.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

26.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

27.     "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

28.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

29.     The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2; 80 F.R. § 37054.

30.     The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

31.     The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

32.     Private citizens may sue under the Clean Water Act to enforce the specific

provisions of California's General Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1139 (9th Cir.1998).

**B.     California's IGP.**

33.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

34.     California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

35.     The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

36.     Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

37.     In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12; Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

38.     Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC codes 20XX through 39XX require coverage by the Permit. *Id*., Attachment A.

39.     Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.      The IGP Discharge Prohibitions.**

40.      The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." *Id*. § III.A.

41.      The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges" or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

42.      These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

43.      The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

44.      The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

45.      Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.      The IGP Effluent Limitations.**

46.      The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

47.      Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and

grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

48.     Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

49.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); 86 Fed. Reg. 10,269; *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

50.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

51.     Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

52.     The 2015 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0–9.0 s.u; .68 mg/L for N+N; .014 mg/L for copper; .082 mg/L for lead; .12 mg/L for zinc; and 1.0 mg/L for iron. 2015 MSGP Fact Sheet at 55–56.

53.     The 2021 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0–9.0 s.u; .68 mg/L for N+N; .00519 mg/L for copper; .082 mg/L for lead; and .12 mg/L for zinc. 2021 MSGP Fact Sheet at 80–81.

/././

**E.      The IGP Receiving Water Limitations.**

54.      The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permits § VI.B.

55.      Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

56.      The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id.* § VI.A.

57.      Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

58.      WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

59.      The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

60.      The Beneficial Uses for San Vicente Creek in Slaughterhouse Canyon, downstream from the Facility, include: industrial service supply, contact recreation, non-contact water recreation, warm freshwater habitat, wildlife habitat, and the potential beneficial use of municipal supply. Basin Plan, Table 2-2.

61.      The Beneficial Uses for the San Diego River downstream from the Facility, include: agricultural supply, industrial service supply, contact recreation, non-contact water recreation, preservation of biological habitats of special significance, warm

freshwater habitat, wildlife habitat, and rare, threatened, or endangered species. *Id*., Table 2-2.

62.    The Beneficial Uses for the Mouth of the San Diego River include: contact recreation, non-contact water recreation, commercial and sport fishing, estuarine habitat, wildlife habitat, marine habitat, migration of aquatic organisms, spawning, reproduction, and/or early development, shellfish harvesting, and rare, threatened, or endangered species. *Id*., Table 2-3.

63.    Pacific Ocean Beneficial Uses include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aqua culture; and rare, threatened, or endangered species. *Id.*

64.    Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

65.    According to the 2020/2022 303(d) List, the lower segment of the San Diego River is impaired for benthic community effects, bifenthrin, chlordane, chloride, color, cyfluthrin, cypermethrin, indicator bacteria, nitrogen, oxygen, dissolved, permethrin, phosphorus, pyrethroids, total dissolved solids, toxicity, turbidity.

66.    Polluted discharges from industrial facilities, such as the BAPKO Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

67.    The following WQS are established by the Basin Plan for the lower San Diego River and San Vicente Creek:  nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-21; 3-46.

68.    The CTR includes numeric criteria set to protect human health and the environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; lead, 0.065 mg/L; zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

69.     Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

**F.       The IGP Storm Water Pollution Prevention Plan Requirements.**

70.     Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A–B.

71.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

72.     The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id*. §§ X.A–I.

73.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020

Permit §§ I.K.69, X.A.9, X.B.1. The IGP require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

74.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id*. § XV.

### G.     The IGP Monitoring and Reporting Requirements.

75.     Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id*. §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

76.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

77.     Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permits § XI.A.1.

78.     A qualifying storm event ("QSE") is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id*. § XI.B.1.

79.     The Reporting Year is defined as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id*. § XI.B.2.

80.     Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id*. § XI.B.11.

81.     Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id*. § XI.B.6.a–b.

82.     Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id*. § XI.B.6.c.

83.     Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id*. § XI.B.6.d.

84.     Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. § XI.B.6.e.

85.     Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

86.     All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. *Id*. § XXI.K.

## H.     The IGP's Exceedance Response Actions Requirements.

87.     The IGP includes Numeric Action Levels ("NALs") that are based on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit § I.M.61; 2020 Permit § I.N.75; *see also id.* § I.M.62 and Table 2.

88.     When the 2015 Permit became effective on July 1, 2015, all permittees were

in "Baseline status." 2015 & 2020 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. 2015 & 2020 Permit § XII.C.

89.    Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. *Id*. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of IGP ("Level 1 Evaluation"). 2015 & 2020 Permit §§ XII.C.1.a–c.

90.    Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA Evaluation, and a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL. 2015 &2020 Permit §§ XII.C.2.a.i–ii.

91.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. 2015 & 2020 Permit § XII.C.2.b.

92.    A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the Reporting Year during which the NAL exceedance(s) occurred. 2015 & 2020 Permit § XII.D.

93.     Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the Reporting Year during which the NAL exceedance(s) occurred.

94.     For each new Level 2 NAL exceedance, the Level 2 Action Plan must identify which of the demonstrations in subsection D.2.a–c the Discharger has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance for (1) a new parameter in any drainage area, or (2) the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area. 2015 & 2020 Permit § XII.D.1.a.

95.     All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 ERA Action Plan. 2015 Permit & 2020 Permit § XII.D.1.d.

96.     The Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the discharger's selected demonstration(s) as described in subsections D.2.a through c of the 2015 and 2020 Permits. 2015 Permit & 2020 Permit § XII.D.1.e.

97.     On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration, (b) Non-Industrial Pollutant Source Demonstration, or (c) Natural Background Pollutant Source Demonstration. 2015 & 2020 Permit §§ XII.D.2.a–c.

98.     NAL exceedances as defined in the IGP are not, in and of themselves, violations of the IGP. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

99.     A "[d]ischarger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is

1   in violation of this General Permit." 2015 Permit § I.M.63; 2020 Permit § I.N.77.

2   **V.      FACTUAL BACKGROUND**

3   **A.      Facility Site Information, Industrial Activities, and Pollutant Sources.**

4   100.   The SMARTS database indicates Clark Steel first obtained IGP coverage to

5   conduct industrial operations at the Facility on March 18, 2003, under Waste Discharge

6   Identification ("WDID") Number 9 37I017996.

7   101.   Plaintiffs are informed, believe, and thereon allege that on or about October

8   1, 2022, BAPKO purchased the Facility and the right, title and interest in and to the name

9   "Clark Steel."

10  102.   Plaintiffs are informed, believe, and thereon allege that since October 1,

11  2022, BAPKO has continued steel manufacturing activities at the Facility and that such

12  activities are ongoing.

13  103.   The Facility continued to answer its phone line at (619) 390-1502 as "Clark

14  Steel" until at least February 14, 2023.

15  104.   On February 15, 2023, BAPKO submitted an NOI to the Regional Board,

16  requesting coverage under the IGP. As of February 21, 2023, this NOI remains pending.

17  105.   According to Clark Steel's SWPPP, NOI, and site map, the Facility is

18  approximately 1 acre, 0.4 acres of which is used for industrial activities and exposed to

19  precipitation and storm water, and the vast majority of the site is impervious.

20  106.   Plaintiffs are informed, believe, and thereon allege that the Facility is

21  approximately 1.25 acres, 0.7 acres of which is used for industrial activities and exposed

22  to precipitation and storm water, and 99% of the site is impervious.

23  107.   The Facility's Standard Industrial Classification ("SIC") code is 3446

24  (Architectural and Ornamental Metal Work), which requires Industrial General Permit

25  coverage.

26  108.   BAPKO is currently licensed in California as a structural steel contractor,

27  ornamental metal contractor, and general building contractor, License # 353005.

28  109.   According to its 2015 SWPPP, the following industrial activities take place

at the Facility: fabricating, storing, welding, cutting, shaping, grinding and sanding, and painting various metals. *See generally*, 2015 SWPPP.

110. In addition, industrial materials used and stored at the Facility include steel, aluminum, red oxide paint, acetone, cutting fluids, cleaning fluids, oils and coolants, metal shavings and welding wire. 2015 SWPPP at 12.

111. Plaintiffs are informed, believe, and thereon allege various industrial materials are also loaded and unloaded in multiple areas of the Facility.

112. Significant materials that may be a source of contaminants at the Facility include red oxide paint, metal shavings, welding wire, stored material, cutting fluids, and cleaning fluids.

113. The Facility's own storm water monitoring data establishes that the Facility frequently discharges high concentrations of aluminum, iron, zinc, and TSS in excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment. Ex. 1, Facility's Storm Water Monitoring Data.

114. The IGP requires facilities with SIC code 3446 to analyze storm water samples for N+N, aluminum, iron, and zinc. § XI.B.6, Table 1.

115. Clark Steel failed to analyze its storm water samples for these parameters until the County of San Diego warned Clark Steel that it was remiss in testing for all parameters required by Table 1 of the IGP in February 2020. Ex. 1, Feb. 6, 2020 County of San Diego Stormwater Inspection Report. Only after this warning, did the Facility begin sampling for N+N, aluminum, iron, and zinc in April 2020.

116. A 2019 lab report disclosed that barium, chromium, cobalt, copper, nickel, and zinc are all present in significant quantities in the primer used by the Facility to paint its metal structures. Ex. 1, Facility's Krylon Ind. Primer K00020001 Sample Results. Lead, chromium, copper, zinc, and nickel are considered toxic under the California Toxics Rule, and the Regional Water Board Water Quality Control Plans ("Basin Plan") regulates the discharge of iron and TSS.

117. A County of San Diego Compliance Inspection Report dated April 18, 2022

noted the presence of 30 gallons of propane, 90 gallons of gasoline, nitrogen cylinders, argon cylinders, acetylene cylinders, tank coolants, and five 55 gallon drums of oily water (waste coolant) at the Facility. Ex. 1, County of San Diego Compliance Inspection Report.

118.    The EPA has identified copper, chromium, nickel, manganese, and lead as pollutants which may be released from architectural and structural metal manufacturing facilities.[1]

119.    Plaintiffs are informed, believe, and thereon allege that since its purchase of the Facility, Defendant's industrial activities and materials have not been materially altered.

120.    Plaintiffs are informed, believe, and thereon allege that the Facility's pollutants and pollutant sources have not been materially altered.

121.    Plaintiffs are informed, believe, and thereon allege that the storm water and non-storm water pollution pathways, BMPs, and storm water management practices at the Facility have been and continue to be the same or substantially similar to those prior to October 1, 2022.

122.    According to the 2015 SWPPP, the Facility has four storm drain inlets: one in the northern area, one in the southern area, and two along the eastern edge of the Facility.

123.    According to the 2015 SWPPP and site map, the Facility has three drainage areas.

124.    The northwestern drainage area includes the main staging and fabrication area, outdoor work areas, an uncovered temporary storage rack, the main ingress/egress driveway, and the parking lot. Storm water and non-storm water from this area flow into the northern drain, and is directed and discharged onto Vigilante Road via curb pipes

---

[1] U.S. Environmental Protection Agency, *Metal Manufacturing and Fabrication Fact Sheet*, https://www.epa.gov/system/files/documents/2022-02/metal-manufacturing-and-fabrication_508.pdf.

west of the driveway.

125.   According to the Facility site map, storm water and non-storm water from an additional uncovered storage rack area, a scrap bin, the painting and cleaning area, a smaller staging area, and another outdoor work area drain into the South drain and are directed and discharged into San Vicente Creek via underground pipes.

126.   According to the site map, storm water and non-storm water from the eastern side of the facility near various storage racks drain into the East drains and are directed and discharged onto Vigilante Road via curb pipes east of the driveway.

127.   Plaintiffs are informed, believe, and thereon allege that all discharges from the Facility flow into San Vicente Creek, the San Diego River, and eventually to the Pacific Ocean.

128.   Plaintiffs are informed, believe, and thereon allege that industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

129.   Plaintiffs are informed, believe, and thereon allege that many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

130.   Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

131.   Plaintiffs are informed, believe, and thereon allege that one or more regulated industrial activities are conducted at locations throughout the entire Facility,

and thus the entire Facility requires IGP coverage.

132.   Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire Facility, BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

133.   Plaintiffs are informed, believe, and thereon allege that, due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and non-storm water commingles with storm water, and thus all discharges from the Facility are regulated under the IGP.

134.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

135.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

136.   Plaintiffs are informed, believe, and thereon allege that Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

137.   Plaintiffs are informed, believe, and thereon allege that the Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

138.   Plaintiffs are informed, believe, and thereon allege that elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES   20

139.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the Facility impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.   The Facility Discharges Contaminated Storm Water in Violation of the IGP.**

140.   Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

141.   Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

142.   Plaintiffs are informed, believe, and thereon allege that storm water and non-storm water discharges from the Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the IGP.

**1.   Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.**

143.   Plaintiffs are informed, believe, and thereon allege that the Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

144.   The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

145.   "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

146.   The Facility's own storm water monitoring data demonstrates the Facility

has discharged, and continues to discharge, concentrations of aluminum, iron, zinc, and TSS in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1, Facility's Storm Water Monitoring Data. Plaintiffs are informed, believe, and thereon allege these polluted discharges cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Discharge Prohibition III.C.

147.   Plaintiffs are informed, believe, and thereon allege the Facility has discharged and continues to discharge unauthorized NSWDs in violation of IGP Discharge Prohibition III.B.

148.   For example, the 2015 SWPPP acknowledges that spills of cutting fluid, cleaning fluid, paint, acetone, and various oils and coolants can and do occur at the Facility. While the SWPPP outlines some basic BMPs such as the use of absorbents, sweeping, tarps, and cleaning with rags, the SWPPP fails to identify BMPs that would prevent the commingling and discharge of all pollutants associated with cutting fluids, cleaning fluids, paint, and acetone, which are absolutely prohibited.

149.   Plaintiffs are informed, believe, and thereon allege Defendant has violated and continues to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

150.   Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

151.   "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

152.   Accordingly, where the "quality of the discharge" does not meet water

quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

153.   Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

154.   As such, Plaintiffs are informed, believe, and thereon allege the Defendant has violated and continues to violate Discharge Prohibition III.D of the 2015 and 2020 Permits by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

155.   The Facility's own storm water monitoring data shows numerous instances of concentrations of iron and TSS far in excess of respective Basin Plan water quality objectives, as well as zinc concentrations far in excess of CTR criteria. Ex. 1, Facility's Storm Water Monitoring Data.

156.   Upon information and belief, the Facility has discharged and continues to discharge numerous additional pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D. For example, the EPA has determined that manganese, copper, chromium, lead, and nickel are contaminants commonly released to water in the process of architectural and structural metals manufacturing.

157.   The Facility has never sampled for these parameters. The discharge of manganese is governed by the San Diego Basin Plan water quality objectives, and chromium, copper, lead, and nickel, are all controlled by the CTR.

158.   Plaintiffs are informed, believe, and thereon allege the Facility also discharges these pollutants in excess of Basin Plan objectives and CTR criteria in violation of Discharge Prohibition III.D.

159.   Plaintiffs are informed, believe, and thereon allege that the industrial activities and materials, pollutants and pollutant sources, and storm water management at the Facility have not been materially altered since Defendant's purchase of the Facility,

and that as such, BAPKO has violated and continues to violate IGP Discharge Prohibitions III.B–D.

160.    Each time the Facility discharges polluted storm water or non-storm water in violation of Sections III.B–III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

161.    These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

162.    Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Discharge Prohibitions since at least October 1, 2022 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. *See* Exhibit 1 (setting forth dates of all precipitation events during the past five years).

### 2.    Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.

163.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

164.    The Facility's own storm water monitoring data indicates that the Facility's storm water discharges frequently exceed the EPA benchmarks for aluminum, zinc, N+N, and TSS. For example, on March 3, 2021, the Facility discharged concentrations of aluminum at 2.96 mg/L exceeding the benchmark of 1.1 mg/L; zinc at 5.61 mg/L exceeding the benchmark of 0.12 mg/L; and TSS at 138 mg/L exceeding the benchmark of 100 mg/L.

165.    Moreover, every sample collected by the Facility in the past five years reveals exceedances of at least one EPA Benchmark, and frequently exceedances for multiple parameters.

166.   Visual observations of the Facility confirm that it lacks adequate BMPs. On August 21, 2022 direct observations showed steel beams, debris, other materials on the ground and rusting; storage racks without covers; worn and torn tarps over other storage racks; plastic buckets stacked high without cover or secondary containment; and some structural covers so high as to be ineffective at sheltering the materials from rain.

167.   Plaintiffs are informed, believe, and thereon allege that the industrial activities and materials, pollutants and pollutant sources, and storm water management at the Facility have not been materially altered since Defendant purchased the Facility, and that as such, BAPKO has violated and continues to violate IGP Effluent Limitations.

168.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

169.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

170.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since at least October 1, 2022 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.   Discharges of Polluted Storm Water from the Facility Violate IGP Receiving Water Limitations.

171.   Plaintiffs are informed, believe, and thereon allege that the Facility has violated and continues to violate IGP Receiving Water Limitations. *See* 2015 & 2020 Permits § VI.A.

172.   The Facility's own storm water monitoring data demonstrates that the Facility has repeatedly discharged numerous TSS and iron in excess of Basin Plan Water Quality Objectives, and zinc in excess of CTR standard.

173.   The CTR and Basin Plan are applicable WQSs under the IGP, and thus

violations of the CTR and Basin Plan objectives are violations of the IGP Receiving Water Limitations.

174.   As explained *supra*, the Receiving Waters of the Lower San Diego River are impaired several pollutants, including benthic community effects, color, TDS, toxicity, and turbidity.

175.   A principal cause of discoloration in water is the discharge of rusted metals. These metals in water result in discoloration ranging from yellow, orange, red, brown, and black.

176.   Plaintiffs are informed, believe, and thereon allege the Facility produces metal shavings, welding wire, and metal dust through its processes of cutting, welding, grinding, and sanding metal. The Facility's own storm water monitoring data indicates that the Facility regularly discharges extremely high concentrations of iron, far in excess of the Basin Plan water quality objective. Ex. 1.

177.   Plaintiffs are informed, believe, and thereon allege the Facility's discharges of high concentrations of iron in excess of the Basin Plan objective cause and/or contribute to the color impairment of the San Diego River.

178.   Lead, chromium, copper, zinc, nickel, manganese, are all toxic pollutants in aquatic environments, and limitations on lead, chromium, copper, zinc, and nickel are specifically enumerated in the CTR. 40 C.F.R. § 131.38.

179.   Plaintiffs are informed, believe, and thereon allege the Facility's discharges of high concentrations of zinc in excess of the CTR standard cause and/or contribute to the toxicity impairment of the San Diego River.

180.   Furthermore, the Facility has never analyzed its storm water samples for lead, chromium, copper, manganese, or nickel even though they are pollutants commonly associated with architectural and ornamental metal fabrication.

181.   Plaintiffs are informed, believe, and thereon allege the Facility also discharges high concentrations of lead, chromium, copper, manganese, or nickel, further causing and/or contributing to the River's toxicity impairment.

182.   Dissolved metals impact the concentration of TDS in the Receiving Waters.

183.   Plaintiffs are informed, believe, and thereon allege the Facility's significant discharges of multiple metals, as evidenced by the repeatedly high levels of iron, zinc, and aluminum in its storm water discharges, indicates the Facility also causes and/or contributes to the River's TDS impairment.

184.   High turbidity is closely associated with TSS values.

185.   The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-32.

186.   "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id*. at 3-31.

187.   As such, Plaintiffs are informed, believe, and thereon allege the Facility's discharges of high concentrations of TSS cause and/or contribute to the San Diego River's TDS and benthic community effects impairments.

188.   Plaintiffs are informed, believe, and thereon allege the Facility has discharged, and continues to discharge concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to multiple impairments of downstream Receiving Waters in violation of IGP Receiving Water Limitations. *See* 2015 & 2020 Permits § VI.A.

189.   Plaintiffs are informed, believe, and thereon allege the discharges of elevated concentrations of pollutants in the Facility's storm water and non-storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the IGP Receiving Water Limitations. *See* 2015 & 2020 Permits § VI.B.

190.   Plaintiffs are informed, believe, and thereon allege that the industrial activities and materials, pollutants and pollutant sources, and storm water management at the Facility have not been materially altered since Defendant purchased the Facility, and

that as such, BAPKO has violated and continues to violate IGP Receiving Water Limitations.

191.   Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

192.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation since October 1, 2022 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

193.   Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

**C.    Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

194.   Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

195.   Clark Steel submitted a SWPPP to SMARTS on June 29, 2015, and never amended or updated this SWPPP.

196.   Plaintiffs are informed, believe, and thereon allege that the Facility is currently operating without a valid SWPPP.

197.   Plaintiffs are informed, believe, and thereon allege the Facility SWPPP fails to contain BMPs that would prevent the exposure of pollutants to storm water, the comingling of non-storm water with storm water, and the subsequent discharge of pollutants from the Facility, in violation of the IGP. For example, the in inadequacy of the SWPPP's BMPs are evidenced by the consistently high levels of pollutants in the Facility's storm water discharges. Over the past five years, every storm water sample collected by the Facility has contained pollutants that exceeded WQSs and/or EPA Benchmarks, indicating the Facility has failed, and continues to fail, to meet SWPPP

BMP requirements.

198.   Plaintiffs are informed, believe, and thereon allege identified BMPs are not being adequately implemented. For instance, the Facility SWPPP states that materials would be stored on racks off the ground, covered with tarps or by overhead structures. However, direct observations indicate materials continue to be stored on the ground, tarps are worn or ineffective, and storage racks either lack covers or covers fail to shelter the materials from rain.

199.   Plaintiffs are informed, believe, and thereon allege that BAPKO has operated the Facility since at least October 1, 2022 without a valid SWPPP.

200.   Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act.

201.   Plaintiffs are informed, believe, and thereon allege Defendant has been in daily and continuous violation of the IGP's SWPPP requirements since at least October 1, 2022.

202.   Plaintiffs are informed, believe, and thereon allege these violations are ongoing, Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since October 1, 2022.

**D.    Defendant Has Failed to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan at the BAPKO Facility.**

203.   Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

204.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to collect the required number of storm water samples for each reporting period.

205.   The IGP requires Permittees to collect samples from two storm events within the first half of each Reporting Year (July 1 to December 31), and from two storm events

within the second half of each Reporting Year (January 1 to June 30).

206.   Plaintiffs are informed, believe, and thereon allege BAPKO has failed to collect any storm water samples since purchasing the business on October 1, 2022 in violation of IGP MIP requirements. *See* 2015 & 2020 Permits § XI.A.

207.   Numerous QSEs and large storm events have occurred since BAPKO became the owner and/or operator of the Facility. *See* Ex. 1, NOAA Precipitation Data.

208.   Clark Steel also failed to collect the required number of samples each year. For example, Clark collected zero samples during the 2017-2018 reporting period, only one sample in 2018-2019, 2019-2020, and 2021-2022, and two samples in 2020-2021. Although the Facility's Annual Reports claim the lack of sampling was due to a lack of QSEs, NOAA precipitation data belie these claims. Ex. 1.

209.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to develop and/or implement a MIP that requires the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of Industrial General Permit. *See* 2015 & 2020 Permits § XI.B.4.

210.   While Section XI.C.4 of the Permit allow permittees to reduce the number of locations to be sampled, there is no indication the Facility Owners and/or Operators have complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

211.   However, the Facility Owner and/or Operator has never collected samples from the two drains located on the eastern portion of the Facility.

212.   Additionally, while Clark Steel collected samples from either the "North Drain" or the "South Drain" during six different QSEs dating back to 2016, the Facility Owner and/or Operator has never collected samples from *both* the North and South drains during a single QSE. The Facility lacks any retention capacity that could explain such a failure.

213.   As such, Plaintiffs are informed, believe, and thereon allege the Facility's failure to collect samples from "each drainage area at all discharge locations" is an

ongoing violation of the IGP. *See* 2015 & 2020 Permits § XI.B.4.

214. Plaintiffs are informed, believe, and thereon allege the Facility Owners and/or Operators have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the Industrial General Permit.

215. Table 1 of the Industrial General Permit requires Fabricated Metal Products facilities to test for zinc, N+N, iron, and aluminum. Nevertheless, Clark Steel failed to sample for these pollutants until directed to do so by the County of San Diego in 2020.

216. As discussed *supra*, the Facility has failed to provide a complete accounting of pollutants specific to its site, including all metals present, and all pollutants present in the Facility's cleaning, cutting and cooling fluids, paint and primer, and degreasers. For example, the Facility's own data shows that the primer used onsite contains barium, chromium, cobalt, copper, nickel, in addition to zinc. Additionally, the EPA has determined that manganese, copper, chromium, lead, and nickel are contaminants commonly associated with architectural and structural metals manufacturing.

217. However, the Facility Owners and/or Operators have failed and continue to fail to analyze samples for any of the aforementioned pollutants in violation of Section XI.B.6.c of the IGP.

218. Plaintiffs are informed, believe, and thereon allege the Defendant has failed and continued to fail to sample for pollutants that may contribute to Receiving Water impairments, such as metals that affect water discoloration through rust, metals affecting toxicity (such as lead, chromium, copper, nickel, and manganese), and TDS. *See* 2015 & 2020 Permit § XI.B.6.e.

219. Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs required by the IGP.

220. Plaintiffs are informed, believe, and thereon allege that the industrial activities and materials, pollutants and pollutant sources, and storm water management at the Facility have not been materially altered since Defendant purchased the Facility, and

that as such, BAPKO has violated and continues to violate IGP MIP requirements.

221.   Direct observations, the Facility's lack of BMPs and poor housekeeping, the SWPPP and site map's failure to align with on-the-ground conditions, and BAPKO's failure to collect any storm water samples since purchasing the Facility, indicate Defendant fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

222.   Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

223.   Plaintiffs are informed, believe, and thereon allege Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least October 1, 2022.

224.   Plaintiffs are informed, believe, and thereon allege these violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since at least October 1, 2022.

## V.      CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

225.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

226.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge unauthorized non-storm water in violation of Section III.B of the IGP.

227.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving

Waters in violation of Section III.C of the IGP.

228.    Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

229.    Plaintiffs are informed and believe, and thereon allege that Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from at least October 1, 2022 to the present. Plaintiffs are informed and believe, and thereon allege that Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

230.    Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 1, 2022 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

231.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

232.    Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

233.    Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

234.    Defendant's failure to develop and/or implement BMPs that achieve the

pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

235.   Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

236.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from at least October 1, 2022 to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

237.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

238.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since October 1, 2022. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## THIRD CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

239.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

240.   Plaintiffs are informed and believe, and thereon allege, that the Facility

discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

241.   Plaintiffs are informed and believe, and thereon allege, that Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

242.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

243.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

244.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 2015 & 2020 Permits §§ VI.A–B; 33 U.S.C. § 1311(b).

245.   Plaintiffs are informed, believe, and thereon allege Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

246.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from at least October 1, 2022 to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

247.   Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

248. Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

249. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since October 1, 2022. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

250. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

251. Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

252. Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

253. Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

254. Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from at least October 1, 2022, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

255. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

256. Each day Defendant operates the Facility without developing and/or

implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since October 1, 2022. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

257.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

258.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

259.   Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

260.   Defendant has been in violation of the IGP MIP requirements every day from at least October 1, 2022, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

261.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

262.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since October 1, 2022. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

263.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

264.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

265.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to collect and analyze the required number of storm water samples the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

266.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

267.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to collect storm water samples "from each drainage area at all discharge locations" at the Facility in violation of IGP and CWA. *See* 2015 & 2020 Permits § XI.B.4; *see also* 33 U.S.C. § 1311(b).

268.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since at least October 1, 2022. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

269.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

270.   Each and every violation of the IGP's monitoring requirements is a separate

and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since October 1, 2022. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

271.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

272.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## VI.   RELIEF REQUESTED

273.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.   A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.   A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d.   A court order assessing civil monetary penalties for each violation of the CWA at $64,618 per day per violation for violations that occurred after November 2, 2015 and assessed on or after January 6, 2023, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40

C.F.R. § 19.4.

     e.     A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

     f.     Any other relief as this Court may deem appropriate.

Dated: February 28, 2023

Respectfully submitted,

COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com


SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org